UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MICHAEL HOLMES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:12-CV-2333-HEA |
| | ) |
| MAYOR FRANCIS G. SLAY, et al., | ) |
| | ) |
| Defendants. | ) |

EXCERPT OF TESTIMONY OF ALAN RAY
JURY TRIAL
VOLUME 4

BEFORE THE HONORABLE HENRY E. AUTREY
UNITED STATES DISTRICT JUDGE

MARCH 3, 2016

APPEARANCES:

For Plaintiff:       David B. Owens, Esq.
                     Roshna B. Keen, Esq.
                     Sarah L. Grusin, Esq.
                     LOEVY & LOEVY

For Defendants:      H. Anthony Relys, AAG
                     Robert J. Isaacson, AAG
                     ATTORNEY GENERAL OF MISSOURI

*REPORTED BY:*       *Gayle D. Madden, CSR, RDR, CRR*
                     *Official Court Reporter*
                     *United States District Court*
                     *111 South Tenth Street, Third Floor*
                     *St. Louis, MO  63102      (314) 244-7987*
             (Produced by computer-aided mechanical stenography.)

## <u>INDEX</u>

*Witness:*

**<u>ALAN RAY</u>**

     Direct Examination by Mr. Owens . . . . . . . . . Page  3
     Cross-examination by Mr. Isaacson . . . . . . . . Page 17
     Redirect Examination by Ms. Keen  . . . . . . . . Page 19

1                          **ALAN RAY**,

2    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

3    FOLLOWS:

4                       DIRECT EXAMINATION

5    BY MR. OWENS:

6    Q    Good morning, Mr. Ray.

7    A    Good morning.

8    Q    Would you please introduce yourself to the Jury?

9    A    My name is Alan Ray.

10   Q    And you were a police officer here in St. Louis for a

11   number of years; correct?

12   A    Yes, I was a police officer and a sergeant.

13   Q    And you're joining us today from sunnier skies in

14   Florida; is that right?

15   A    Yes.

16   Q    How long have you lived in Florida?

17   A    I've lived in Florida for four years now.

18   Q    And what year did you move there?

19   A    I moved there February of 2010.  No.  2011.

20   Q    And I'm going to rewind the clock a little bit.  In

21   December of 2003, Shell Sharp was your partner; is that right?

22   A    Oh, what was the date?

23   Q    Back in December of 2003 --

24   A    Yes.

25   Q    -- Mr. Shell Sharp was your partner?

Alan Ray Direct Examination                              Volume 4

4

1   A    Yes.

2   Q    And he was your partner for over a year; correct?

3   A    Umm, approximately a year.

4   Q    And it's your understanding that you're here today to

5   testify in defense of Mr. Sharp; is that correct?

6   A    Yes.

7   Q    And you understand that he's been sued in a lawsuit; is

8   that right?

9   A    Yes.

10  Q    And how long were you a partner, approximately, with

11  Mr. Sharp?

12  A    Approximately a year.  I'm not sure of the exact months.

13  Q    Okay.  And so the events that you're here to talk to us

14  about today from December of 2003 -- those took place at

15  5894 Cates Avenue.  Does that sound about right?

16  A    Yes.  5893?  5894, I believe, wasn't it?

17  Q    I think it was 5894, but --

18  A    Yes.

19  Q    -- on Cates Avenue; is that right?

20  A    Yes.

21  Q    Okay.  But you don't really remember much about that

22  incident; is that fair to say?

23  A    After talking to you yesterday, it jogged my memory.

24  Q    Okay.  So we spoke yesterday; is that right?

25  A    Yes.

Alan Ray Direct Examination                          Volume 4

5

1  Q    And at the time, you told me that you didn't remember

2  anything about the surveillance that happened before you went

3  into the Cates house; is that right?

4  A    Yesterday, I did.

5  Q    Yeah.  And you told me yesterday that you didn't remember

6  whether or not there was a confidential informant involved; is

7  that right?

8  A    No.

9  Q    You didn't tell me that yesterday?

10 A    I did not tell you that yesterday.

11 Q    Okay.  And you didn't tell me whether or not you could

12 remember anything about this surveillance that happened before

13 you went to the Cates house; is that right?

14 A    No.

15 Q    And you -- yesterday when we talked, you told me, "I

16 don't remember anything about the surveillance that took place

17 before" --

18 A    No, I did not.

19 Q    Okay.  And you agree with me today that this was

20 Mr. Sharp's investigation?

21 A    Yes.  He was the lead officer on the case.

22 Q    And you indicated that you -- you don't have any

23 information about what led you guys to the Cates house; is

24 that right?

25 A    What led us to the Cates house?

1    Q    Yeah.  You don't have any personal memory of that today?

2    A    I -- like I said, after talking to you yesterday, it

3    jogged my memory, and, yes, I did.

4    Q    Okay.  So did you review any documents between yesterday

5    afternoon and today?

6    A    No, I didn't.

7    Q    Okay.  And let's just back up a little bit because I

8    think it's probably -- we had a conversation yesterday, but

9    there are a bunch of other people that weren't there.  So

10   let's catch them up.  Now, you're going to talk to us about

11   December 3rd or -- excuse me -- December 9th, 2003, and do you

12   understand that after that time, in 2006, Mr. Michael Holmes

13   was convicted related to those events?

14   A    No, I did not know until you told me yesterday.

15   Q    Okay.  And do you have any reason to dispute that?

16   A    I don't know you.  So I was going on what you told me.

17   Q    Okay.  I appreciate that.  So between 2003 and 2006, did

18   you have a conversation with anybody about the events of

19   December 9th?

20   A    Not that I remember.

21   Q    Did you ever talk to Shell Sharp about that, those

22   events, after that night?

23   A    After that night?

24   Q    Yeah, until --

25   A    Of December 3rd?

Alan Ray Direct Examination                              Volume 4

7

1  Q    Between -- before 2006.

2  A    Before 2006?  Not that I remember.

3  Q    Okay.  And so between 2003 and 2006, did you talk to any

4  state prosecutors?

5  A    No.

6  Q    Did you talk to any federal prosecutors?

7  A    In 2006?

8  Q    Between 2003 and 2006.

9  A    No.

10  Q    Okay.  Did you write any reports about the incidents that

11  happened at the Cates house in December of 2003?

12  A    2003?

13  Q    Excuse me.  Did you write any reports after you were in

14  the house on December 9th of 2003?

15  A    After, yes.

16  Q    All right.  You wrote a report?

17  A    I -- in August of 2011 --

18  Q    Okay.

19  A    -- I did a declaration.

20  Q    Okay.  And it was -- yesterday when we spoke, you didn't

21  even remember that you wrote that declaration; is that right?

22  A    Not until I talked to you.  You told -- I had said I

23  wrote a declaration, and then you told me that it was some

24  other thing that I had wrote, and I said I didn't even know

25  then.  I don't even know what a declaration is because you had

1   told me it was some other --

2   Q    Okay.

3   A    -- thing, but I thought it was a declaration I did in

4   August of 2011.

5   Q    Okay.  So let's just be really clear.  What's your

6   understanding of what a declaration is?

7   A    A declaration -- what I did and what I thought it was

8   for -- the federal court --

9   Q    Absolutely.

10  A    -- was that I was in a courtroom -- was in a room with

11  two attorneys, and there was a -- I don't know --

12  Q    A stenographer?

13  A    -- a stenographer in there, and they asked me questions

14  about the case, and they type it up.

15  Q    Okay.  And --

16  A    And I'm also sworn in too.

17  Q    So you were under -- so you gave some testimony under

18  oath --

19  A    Yes.

20  Q    -- back in 2011?

21  A    Yes.

22  Q    Is that right?

23  A    I believe so.  I think I was under oath, yes.

24  Q    Okay.  And now, before you gave that testimony under oath

25  in 2011, between 2003 and 2011, did you provide any other

1   testimony about the December Cates incident?

2   A    No, I did not.

3   Q    Okay.  And did you talk to any other law enforcement

4   agencies before 2011 but after 2003?

5   A    No.

6   Q    Okay.  Now, I think you just described -- you thought

7   that you were sitting with some attorneys questioning you and

8   a stenographer there?

9   A    Uh-huh.

10  Q    Did you have a chance to read anything from that event

11  before coming today?

12  A    Yes, I did.

13  Q    And what did you read?

14  A    I read what I thought was a declaration of what the

15  incident -- what I said happened.

16  Q    Did this have your signature on it?

17  A    Did it have my signature?  No.

18  Q    Now, have you ever signed any sworn statements related to

19  this incident?

20  A    No.

21  Q    Okay.  And you've never signed something that said,

22  "Under perjury of penalty (sic), these are the statements that

23  I have to make about this case"?

24  A    I don't know.  I don't think so.

25  Q    Okay.  And -- now, Mr. Ray, I think that you said that

1    you -- you retired in 2013; is that right?

2    A    I was a police officer from August of 1990 through

3    February of 2011.

4    Q    Of 2011.

5    A    Yes.

6    Q    Okay.  My apologies.

7    A    And I retired as a police sergeant.

8    Q    Okay.  You retired as a police sergeant, but not for

9    St. Louis; correct?

10   A    Yes, for St. Louis, I retired as a police sergeant.

11   Q    And did you work somewhere as a police officer after

12   that?

13   A    Yes.  I worked at UMSL, which is the University of

14   Missouri-St. Louis, and I went over there as a sergeant, and I

15   worked approximately two years.

16   Q    Okay.  Until 2013?

17   A    Yes, I believe, until 2013.

18   Q    And so did you finally retire in 2013?

19   A    From policing?

20   Q    Yes.

21   A    Yes.

22   Q    And were you discharged from the military at that time?

23   A    Yes.  I was discharged -- I was in the military from 1987

24   through 2014.  I was discharged on a medical disability.  I'm

25   100 percent disabled.

1   Q    Okay.  And could you tell us what your medical disability

2   is, sir?

3   A    I'm just -- I was involved over in Iraq in 2005 to 2007

4   for two years, and my vehicle was struck by an IED, and I was

5   inflicted with a bunch of injuries from that incident.

6   Q    Okay.  And does -- it's true, though, that your medical

7   disability also affects your ability to remember things

8   accurately?

9   A    No.  Actually, it's the opposite.  Unfortunately, it's

10  the opposite.

11  Q    You didn't want to tell me that yesterday; is that right?

12  A    Yes.  I didn't want to disclose none of my medical

13  history.

14  Q    So back to 2011, before you went and you talked to some

15  people about this incident for the first time, you read Shell

16  Sharp's report; correct?

17  A    Yes, I did prior to doing the declaration on 2011.

18  Q    What's that?  Sorry.

19  A    Yes, I did.

20  Q    Okay.

21  A    Prior to doing the declaration here at the federal court

22  on August of 2011.

23  Q    Okay.  And did you look at any other documents before

24  that day?

25  A    Before that day?  No.

12

1  Q    Okay.  Before you came in to talk to those guys in 2011,

2  did you look --

3  A    I looked at the police report, yeah.

4  Q    And that police report -- when you say "the police

5  report," we're talking about the one that Shell Sharp wrote?

6  A    Yes, the police report that Shell Sharp wrote, that

7  Officer Shell Sharp wrote.

8  Q    Correct.  And, well, the police report that Officer Sharp

9  wrote -- that was the only document that you looked at before

10  you went and met with folks in 2011?

11  A    Yes, it was the only document.

12  Q    Okay.  Okay.  Mr. Ray, so it's your testimony that at --

13  on December 9th, 2003, that you were in a stairwell; is that

14  correct?

15  A    Yes, I was.  I was in a stairwell.

16  Q    And that you were going up the stairs in that stairwell;

17  is that right?

18  A    Yes, I was.

19  Q    And it's your testimony that an African-American man in a

20  yellow jumpsuit was coming down the stairs; correct?

21  A    A jumpsuit?  No.  A jogging suit.

22  Q    Jogging suit.  My --

23  A    Yeah, a yellow jogging suit.

24  Q    Okay.  And that he was coming down the stairs?

25  A    Yes, he was.

1   Q    And the only other person in the stairwell at that time

2   was Mr. Shell Sharp?

3   A    Mr. -- Officer Sharp and myself.

4   Q    Yeah.  Officer Shell Sharp and yourself?

5   A    Uh-huh.

6   Q    You were the only other -- you were the only three people

7   in the stairwell at the time?

8   A    Yes, we were.

9   Q    Okay.  And then it's your testimony that you saw the man

10  in the yellow jogging suit drop the bag; is that right?

11  A    He dropped a brown paper bag.

12  Q    And then after he dropped the bag, you went up the stairs

13  to apprehend him; is that correct?

14  A    Yes.  After he dropped the bag, Officer Shell Sharp -- I

15  remember like it was yesterday -- said, "Get him before he

16  gets to the top."

17  Q    Okay.  And after Sharp said that, you didn't see what

18  happened to the bag; correct?

19  A    No, I didn't.  After -- after that, I had like tunnel

20  vision, and all I could see was the guy in the yellow jogging

21  suit.

22  Q    Okay.  So I want to just take you back.  You don't know

23  what happened to the bag after you had that tunnel vision and

24  continued up the stairs?

25  A    No, I don't.

1   Q    And you didn't later process that bag for evidence;

2   correct?

3   A    No.

4   Q    It was Shell Sharp's investigation?

5   A    It was -- he was the lead officer.

6   Q    Okay.  And so you were there to assist?

7   A    I was his assisting officer.

8   Q    Now, in that stairwell, were you on the second floor?

9   A    We were on the second -- on the second floor.  He was

10  running up to the third floor.

11  Q    Okay.  So you weren't on the first floor; is that right?

12  A    I don't believe so, no.

13  Q    Okay.  And nobody else was in that stairwell?

14  A    Only Officer Sharp and myself.

15  Q    Okay.  And now I think we talked about this a little

16  yesterday too -- is -- is that the man in the yellow jogging

17  suit, you've identified as Mr. Holmes; is that correct?

18  A    Yes.  At that time, I had only known him by his nickname

19  because I remember Officer Sharp telling me prior to that,

20  "Yeah, Big -- there's a guy, Big Mike lives here, and he

21  supposedly has dope, and we better be careful because he also

22  has guns up in there."

23  Q    Okay.  And you didn't do anything yourself to find out

24  the identity of this guy; is that correct?

25  A    No, I did not.  Not myself.

Alan Ray Direct Examination                          Volume 4

15

1    Q    Right.  Mr. Sharp is the one who ran --

2    A    Yes.

3    Q    -- his identifiers?

4    A    Yes.

5    Q    And Mr. Sharp is the one who got the Social Security

6    number, the date of birth, all of that stuff?

7    A    Yes.

8    Q    Okay.  And I just want to be clear that you didn't know

9    who this guy was when you were chasing him up the stairs.  Is

10   that right?

11   A    All I knew is that he was Big Mike that lived at that

12   residence.

13   Q    Okay.  But you didn't sort of know him personally from

14   any past --

15   A    No.  I never had met him ever.

16   Q    Okay.  He was a stranger?

17   A    Right, right.

18   Q    That's all I'm trying to get at.

19   A    Correct.

20   Q    Just a couple other questions, Mr. Ray.  Thank you for

21   coming here from Florida.  And I understand that you said our

22   conversation yesterday with you jogged your memory a bit.

23   A    It jogged my memory.  Yes, it did.

24   Q    And you were here in town because you were flown out by

25   Mr. Sharp's attorneys; is that correct?

1    A    Are they the state's attorneys?  I don't know who -- who

2    his attorneys are.  All I know is that I received a phone call

3    from the Attorney General's Office and that's who flew me down

4    was the Attorney General's Office.

5    Q    Right, but you didn't --

6    A    Are they representing him?  Is there someone else?

7              MR. ISAACSON:  No.  We need to take this up at

8    sidebar.

9              MR. OWENS:  We can -- I wasn't trying to get into

10   that, Your Honor.  I'll move on.

11             THE COURT:  Thank you.

12   Q    (By Mr. Owens) The issue is, Mr. Ray, you didn't pay for

13   your own transportation here; is that correct?

14   A    Yes, I did.

15   Q    Oh, you did.  Okay.  And so you've been here for how

16   long?

17   A    I got here last Thursday.

18   Q    Okay.  And you spoke with Mr. Sharp last week; is that

19   right?

20   A    I called him on my arrival to ask him why I was here.

21   Q    Okay.  And then you had a conversation with him?

22   A    He said that I was here because --

23             MR. ISAACSON:  Your Honor, I think we have to -- this

24   would be hearsay.

25             THE COURT:  Well --

17

```
 1              MR. OWENS:  It's part of your --

 2              THE COURT:  -- it may be, but -- but --

 3              MR. ISAACSON:  And we don't know that.  We don't know

 4   that he said that.  Could we have a sidebar?

 5              MR. OWENS:  I don't understand how --

 6              MS. KEEN:  Your Honor, Mr. Sharp's statements to a

 7   witness are a statement by a party-opponent.

 8              THE COURT:  Well, I was just going to say it may be

 9   hearsay, but it may be proper fodder as a possible exception.

10              MR. OWENS:  That would be our position, and I can ask

11   the question again to just avoid this issue.

12   Q    (By Mr. Owens) So without telling me anything that you

13   said out of that conversation with Mr. Sharp, you did talk to

14   him last week once you got into town; is that right?

15   A    Yes, once.

16   Q    And you knew that you'd be coming here to testify on his

17   behalf today; is that right?

18   A    Yes.

19              MR. OWENS:  That's all I have for now.

20              THE COURT:  Mr. Isaacson.

21                      CROSS-EXAMINATION

22   BY MR. ISAACSON:

23   Q    Just a couple questions, Mr. Ray.  The strongest memory

24   you have is from that situation on the steps; is that correct?

25   A    Yes.
```

1   Q    And what is the reason for that?  And that had to do with

2   the urgency of the matter because of the information; is that

3   correct?

4            MR. OWENS:  Objection.  This is leading.

5            THE COURT:  I'll allow the question.  Go ahead.

6   Q    (By Mr. Isaacson) Explain that for the Jury.  What was

7   the urgency there that --

8   A    Once -- once again, like when I said that it jogged my

9   memory, one of the -- one of the injuries I have is known as

10  PTSD, and what PTSD is that it makes you reoccur traumatic

11  events, and one of the traumatic events was when I was

12  involved in the IED, and from then on, all the other traumatic

13  events, it was that I like relive.  And with Mr. Holmes there,

14  that was a traumatic event because I had the tunnel vision

15  that I had talked about earlier, and I remember it like it was

16  yesterday.  Chasing him up the stairs.  Officer Sharp saying,

17  "Get him."  And going through my head is "Holy crap.  He's

18  going up to get a gun," because I know that he got weapons in

19  the house.  So it was like yesterday, and I relived that in

20  my -- my mind.

21  Q    And -- and, sir, just to clear it up, you paid for your

22  transportation up here, but you expect to be --

23  A    I expect to be --

24  Q    You expect to be reimbursed; is that correct?

25  A    Yes, but you know how the government is, so . . .

1              MR. ISAACSON:  Okay.  I have nothing further.

2              THE COURT:  Very well.

3              MS. KEEN:  Your Honor, just very briefly.

4              THE COURT:  Very, very briefly.

5                        REDIRECT EXAMINATION

6    BY MS. KEEN:

7    Q    First of all, thank you for your service in Iraq, and I'm

8    sorry to hear that that happened to you.  Are you saying that

9    you have the PTSD from chasing Mr. Holmes up the staircase?

10   A    That was a traumatic event.

11   Q    And that made your memory of the event -- that affected

12   your memory of the event?

13   A    No.  What PTSD does is that it makes you relive traumatic

14   events.

15   Q    Okay.  So you --

16   A    That was a traumatic event for me.

17   Q    Okay.

18   A    Yes.

19   Q    And, of course, you had been a police officer by that

20   point for many years; correct?

21   A    Yes.

22             MR. ISAACSON:  At this point -- okay.

23   Q    (By Ms. Keen) And did you have -- and you flew out here

24   last week, as we established; correct?

25   A    Yes.

Alan Ray Redirect Examination                          Volume 4

20

1  Q    But you didn't relive the memories of that, that event,

2  until sometime between last night and this morning?

3  A    No, I didn't relive -- relive that event until I talked

4  to the attorney there yesterday.

5  Q    Okay.

6  A    And we talked about exactly what happened, and that

7  brought up --

8  Q    And when you were asked those questions and all those

9  memories came up, you said you really weren't able to remember

10 anything; isn't that right?

11 A    I don't understand the question.

12 Q    When you had the meeting with the attorneys yesterday,

13 you said that you weren't able to remember anything; isn't

14 that fair?

15 A    Until he brought up what we just talked about.

16 Q    Okay.  And just to be clear, at that meeting, there was

17 Mr. Owens, Mr. Isaacson, and another individual named Mort

18 Smith --

19 A    Yes.

20 Q    -- my third witness; is that right?

21 A    Yes.

22            MS. KEEN:  Okay.  Thank you.

23            MR. ISAACSON:  Nothing else, Your Honor.

24            THE COURT:  Nothing else.  Is Mr. Ray excused?

25            MS. KEEN:  Yes, he is, Your Honor.

21

1          MR. ISAACSON:  Yes, Your Honor.

2          THE COURT:  All right.  Thank you, sir.

3          THE WITNESS:  Thank you, Your Honor.

4          THE COURT:  You're free to go.

5          THE WITNESS:  Thank you, Jury.  Thank you.

6       (End of excerpt.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, Gayle D. Madden, Registered Diplomate Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 21 inclusive.

Dated at St. Louis, Missouri, this 22nd day of October, 2016.


_____

/s/ Gayle D. Madden

GAYLE D. MADDEN, CSR, RDR, CRR

Official Court Reporter